## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

-------------------------------------------------------------X

SCOTT ELIAS,                :       **Civ. No. 14-cv-01735**

                          :

        **Plaintiff**,      :       **AMENDED**

                          :       **COMPLAINT**

     -against-          :

                          :

WESLEYAN UNIVERSITY,    :       **JURY TRIAL**

                          :       **DEMANDED**

                          :

        **Defendant**.     :

-------------------------------------------------------------X

Plaintiff Scott Elias (hereinafter referred to as "Plaintiff"), by his attorneys Warshaw Burstein, LLP, as and for his Amended Complaint, respectfully alleges as follows:

### THE NATURE OF THIS ACTION

1.     Plaintiff seeks redress against Defendant Wesleyan University ("Defendant Wesleyan" or "Wesleyan") due to the actions, omissions, errors, and the flawed procedures, and/or negligence and overall failure to provide Plaintiff with an expected standard of due process, concerning the wrongful allegations of sexual misconduct made against Plaintiff, a male, graduating senior student at Defendant Wesleyan in good standing, and a respected member of the Wesleyan Student Assembly ("WSA") and a fraternity brother, with an otherwise unblemished record. The unfounded allegations, accepted without impartial scrutiny or adequate

investigation by Wesleyan University, were reported a month before Plaintiff's scheduled graduation commencement by fellow Wesleyan students, Jane Doe, Jane Doe 2, Jane Doe 3, Witness 1, and Witness 2, who at the time were actively engaged in an extremely polarizing debate regarding their WSA proposal to mandate co-education of Wesleyan's residential fraternities to be presented to the Wesleyan Administration and the Wesleyan Board of Trustees.

2.    It is common knowledge that, at the time of Plaintiff's disciplinary hearings and sanctions, Wesleyan University was undergoing negative public scrutiny and backlash regarding high-profile lawsuits alleging sexual assault and irresponsible regulation, guidance, and supervision of Wesleyan's historic all-male residential fraternities. At the time of Plaintiff's disciplinary hearings and sanctions, Wesleyan was also under increasing pressure from student activists, including the complainants, regarding Wesleyan's perceived lack of vigilance against male students accused of sexual assault, and the perceived failure of Wesleyan to mete out appropriately high sanctions for those found responsible for sexual misconduct.

3.    It was set against this stage that Wesleyan University either succumbed to pressure from various special interest groups or otherwise sought to make an "example" out of Plaintiff as a "fraternity brother" wrongfully accused of sexual misconduct.

2

4.     Accepting slanderous oral remarks and libelous written statements from Plaintiff's former friends at face value while denying Plaintiff the ability to adequately defend himself, Wesleyan University wrongfully found Plaintiff responsible for non-consensual kissing with Jane Doe 3 nearly four years ago and exchanging inappropriate text messages with Jane Doe, notwithstanding the existence of exculpatory evidence. Following Wesleyan's erroneous decisions, Plaintiff was excessively sanctioned to a deferred suspension that restricted Plaintiff's participation in educational programs and activities, including the WSA and pre-paid graduation commencement celebrations.

5.     Plaintiff's reputation has been tarnished, his future career and educational prospects have been imperiled, and his emotional and mental health has been severely compromised. Wesleyan's actions demonstrated a disturbing lack of due process and a frenzied rush to judgment with little thought, if any, given what had actually occurred between Plaintiff and the complainants. Wesleyan failed to reasonably take into account the conspicuous timing of these admittedly collusive and politically-charged unfounded allegations intended to discredit and defame Plaintiff, and from the onset Wesleyan, with great disrespect to the judicial tradition of due process and innocent until proven guilty, treated Plaintiff with hostility, disrespect, and as "guilty before proven innocent."

3

6.     Due to Wesleyan's arbitrary and capricious findings, together with its breach of confidentiality policies notwithstanding assurances from Wesleyan that Plaintiff's student judicial record would remain confidential, Plaintiff was let go from his esteemed position as a congressional staffer to a well-known member of congress; Plaintiff's future career prospects have been put on hold indefinitely; the monies spent on obtaining a college education at Wesleyan squandered; and Plaintiff's emotional and mental health has been greatly compromised by the entire ordeal. As a result of Wesleyan's unprofessional and egregious misconduct, Plaintiff suffers from great anxiety, depression, fear, distress, and apprehension, as well as shame, shock, embarrassment and sadness.  Thus, Plaintiff brings this action to obtain relief based on causes of action for, among other things, violations of Title IX of the Education Amendments of 1972 and state law.

## **THE PARTIES**

7.     Plaintiff is a natural person residing in Nassau County, New York. During the events described herein, Plaintiff was a student at Wesleyan University and resided on the Wesleyan University campus in Middletown, Connecticut.

8.     Upon information and belief, Defendant Wesleyan University ("Defendant Wesleyan" or "Wesleyan") is a private liberal arts college located in Middletown, Connecticut.

4

9.     Plaintiff and Defendant Wesleyan are sometimes hereinafter collectively referred to as the "Parties".

## JURISDICTION AND VENUE

10.     This Court has diversity and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and under 28 U.S.C. § 1332 because: (i) Plaintiff and Defendant Wesleyan are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of costs and interest; and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

11.     This Court has personal jurisdiction over Defendant Wesleyan on the grounds that Defendant Wesleyan is conducting business within the State of Connecticut.

12.     Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.  Agreements, Representations, Covenants & Warranties Between Plaintiff and Defendant Wesleyan

13.     Plaintiff is a New York native who worked diligently in high school, succeeded in advanced placement courses, earned 10 AP credits toward college and graduated with a 98.6 GPA.  While in high school, Plaintiff was an active leader in Student Government, Model United Nations, his School Newspaper and various

extracurricular activities, as well as an AP Scholar with Distinction. Plaintiff scored in the 97th percentile in the SAT standardized college entrance examination.

14.    Setting his sights on an elite liberal arts education committed to boldness, rigor, and practical idealism, Plaintiff applied to Wesleyan University and was accepted to the class of 2014.

15.    Upon his acceptance, Defendant Wesleyan provided Plaintiff with copies of its school policies, including the 2010-2011 University Standards and Regulations ("2010-2011 Regulations") and the 2013-2014 University Standards and Regulations ("2013-2014 Regulations").  The 2013-2014 Regulations were also readily available on Defendant Wesleyan's Internet website.

16.    With respect to its Sexual Misconduct and Assault Policy, Wesleyan's 2010-2011 Regulations state, among other things:

> Consent must be given by participants in sexual activity…Consent may not be given by someone who is asleep, drugged, intoxicated, unconscious, a minor, or by anyone else whose capacity or ability to provide informed consent is otherwise impaired…Likewise, an individual accused of sexual assault does not avoid responsibility because he or she (i.e. the individual accused) was under the influence of alcohol or other drugs.

17.    Wesleyan's 2013-2014 Regulations state, among other things:

> Wesleyan University is fully committed to a policy of equal opportunity and non-discrimination. The University does not discriminate on the basis of race, color, religion, national or ethnic origin, age, disability,

7

veteran status, sex, marital status, sexual orientation, gender identity or gender expression.

2013-2014 Regulations, p. 2.

The right to be protected by standards of justice and fairness in any proceedings with the University.
Note: Fair and reasonable treatment should govern the access to and administration of all university facilities and programs.

2013-2014 Regulations, p. 3.

18.   Wesleyan's policies on Discrimination and Harassment state the

following:

An investigation will be initiated within 30 days of notice of a complaint and will be completed within 60 days…The totality of the circumstances and the context in which the behavior is alleged to have occurred will be considered in determining whether this policy has been violated.

2013-2014 Regulations, p. 22.

19.   According to its policies, "sexual harassment" is defined as follows:

Unwelcome sexual advances, requests of sexual favors, and other verbal or physical contact of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such an individual, or (3) such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile, or offensive living, learning, and/or working environment. The effect will be evaluated based on the perspective of a reasonable person in the position of a complainant.

> A single or isolated incident of sexual harassment may create a hostile environment if the incident is sufficiently severe. The more severe the conduct, the less need there is to show a repetitive series of incidents to provide a hostile environment, particularly if the harassment is physical.

2013-2014 Regulations, p. 23.

20.     With respect to the confidentiality of student records, Wesleyan's 2013-

2014 Regulations state, among other things:

> It is Wesleyan policy to keep the records of Wesleyan students confidential.  Information about students is shared within the University only as needed for legitimate educational purposes.

2013-2014 Regulations, p. 39.

> Wesleyan will not disclose educational records other than "directory information"…Whenever exceptional action is called for and as appropriate, an effort will be made to notify the student as soon as possible.

2013-2014 Regulations, p. 40.

> IV. JUDICIAL PROCEDURES
> A. STUDENTS' RIGHTS
>   10. Confidentiality regarding the outcome of the hearing (except for the complainant's right to be informed of the hearing decision) and any subsequent appeal.

2013-2014 Regulations, p. 11.

21.     In the Fall of 2010, Plaintiff traveled to Middletown, Connecticut to join

the class of 2014 at Wesleyan University.

## II. **One Large Political Conspiracy**

22.    Plaintiff came to the "Little Ivy" known as Wesleyan University in large part because of its self-proclaimed progressive ethos which encourages students to challenge the status quo, improve their community, and build a more just and equitable world. Setting his sights on this admirable goal, Plaintiff became a member of the WSA towards the end of his freshman year at Wesleyan University, hopeful that he could improve his new community through public service.  In fact, Plaintiff quickly established himself as an influential student representative committed to increased transparency, administrative accountability, and student advocacy, which often times put himself at odds with members of the Wesleyan administration, such as Dean Culliton.

23.    Plaintiff first met Jane Doe (Class of 2014) through their service on WSA. Since sophomore year, Plaintiff and Jane Doe became friends and trusted colleagues, often working together as prominent leaders and allies on various topics and resolutions at odds with the Wesleyan Administration. In 2013, Jane Doe was elected to an influential role on the WSA.

### A. Psi Upsilon Lawsuit Tarnishes Greek System's Reputation And Fuels Movement To Ban Fraternities From Campus

24.    In or about March 2014, the Wesleyan community was advised of a lawsuit filed by a female student against Wesleyan's Psi Upsilon national fraternity. The lawsuit alleged that she was sexually assaulted by a fraternity pledge in a common room during a pledge strip show event.

25.    The Psi Upsilon lawsuit, following a previous high-profile lawsuit alleging that one of Wesleyan's historic residential fraternities was a "Rape Factory," caused members of WSA, including Jane Doe and Jane Doe 2, to galvanize efforts to eradicate residential fraternities and remove their presence from campus in the future.

### B. Fabricated Charges of Sexual Misconduct As "The Strawman" To Ensure Success In Co-Education Movement

26.    The WSA held its first meeting after the conclusion of Spring Break, on March 30, 2014, which included an open forum discussion of the "the future of fraternities at Wesleyan" in the wake of the Psi Upsilon lawsuit and growing tension surrounding the supposed link between residential fraternities and "rape culture."

27.    As things heated up surrounding the debate on sexual assault and fraternities on Wesleyan's campus, the WSA considered whether to mandate co-education of residential fraternities, a proposal spearheaded by Jane Doe, together with former WSA members, Witness 1 and Witness 2, who presented "co-

educational" fraternities as a solution to combating sexual assault. The debate over mandatory co-education of residential fraternities became extremely polarizing and personal.

28.     Plaintiff was an influential member of WSA who opposed mandatory co-education of residential fraternities. Plaintiff urged WSA members to support "reforming Greek life" and "community initiatives" as a means to combating sexual violence instead of mandating "co-education" as some sort of false panacea.

29.     In his role as a leader of his historic all-male residential fraternity, Plaintiff served as the official liaison between the fraternity and the University and instituted mandatory bystander intervention training as part of the fraternity initiation process during the 2012-2013 Academic Year. In fact, it is common knowledge that PLAINTIFF was an active leader in the Greek community who spearheaded efforts to encourage the Greek system to create safer spaces and combat sexual violence.

30.     Jane Doe, Jane Doe 2, Witness 1 and Witness 2 were on the opposite side of the debate from Plaintiff, and they didn't like the tenor of Plaintiff's arguments. In response to Plaintiff's suggestion to discuss the efficacy of mandating co-education of residential fraternities, Witness 1 and Witness 2 refused to meet with Plaintiff and expressed their distaste for Plaintiff for the first time.  Ruthlessly banding together with Jane Doe, the three women fashioned a strawman for beating Plaintiff's

opposition to mandatory co-education, namely, that Plaintiff himself was a threat to every female on campus and an egregious perpetrator of sexual assault.

### C. False Charges Are Filed Against Plaintiff & Co-Education Proposal Passes With Success

31.     On April 11, 2014, just 5 days after Witness 1, Witness 2, and Jane Doe disassociated themselves from Plaintiff, Dean Culliton summoned Plaintiff into his office under the guise of discussing the future of residential fraternities.  However, upon his arrival to Dean Culliton's office, Plaintiff was informed that the meeting was not going to be about the future of residential fraternities, but instead, the meeting was to discuss allegations of inappropriate text messages between Plaintiff and Jane Doe in December 2013.

32.     Dean Culliton learned about the December 2013 text messages from Jane Doe and advised that such text messages raised concerns about Plaintiff's behavior with other unspecified women on campus.  Dean Culliton, however, failed to produce the alleged text messages to Plaintiff or provide any additional details. Although Plaintiff was not formally charged with anything yet, Dean Culliton handed Plaintiff a "No Contact Order" and asked him not to attend the next WSA meeting.  It was no coincidence that the agenda for the next WSA meeting was to discuss the mandatory co-education proposal of residential fraternities.

33.    The No Contact Order posed practical concerns for Plaintiff's obligations as an elected member of WSA. It was only after Plaintiff made a modification request of the No Contact Order that Dean Culliton altered the language of the Order to allow Plaintiff to attend the next WSA meeting.

34.    Upon information and belief, Dean Culliton treated Plaintiff with great hostility during the student conduct process because he did not approve of Plaintiff's history of efforts to raise the standard of evidentiary proof utilized in campus judicial proceedings.

35.    Three days later, on April 14, 2014, Plaintiff emailed Dean Culliton to follow up with their last meeting and ensure that he would be able to attend the next WSA meeting on April 20, 2014 because a close vote on co-education of residential fraternities was scheduled to take place on that day.  Much to his chagrin, Plaintiff was advised that Dean Culliton was out of the office on vacation.  Meanwhile, Plaintiff still was not formally charged with any violations of Wesleyan's Code of Non-Academic Conduct.

36.    Later that day, Plaintiff met with Dean Scott Backer who assured him that because Jane Doe's allegations appeared to involve a "stupid drunken message a long time ago," which was an isolated occurrence as opposed to repeated behavior, it would not be "a serious Title IX concern."  Plaintiff left the meeting under the

14

impression that he would be able to participate in the WSA meeting on April 20, 2014.

37.     Meanwhile, the issue of sexual assault and its suggested connection with residential fraternities continued to heat up on campus. On Wednesday April 16, 2014 an article appeared in the Wesleyan Argus with a "call to action" stating that "at the present time, there is an unprecedented political atmosphere on campus that affords our community a tremendous opportunity to take meaningful and effective action to combat campus sexual assault: co-educate and drastically reform our campus's three all-male residential fraternities or forbid them use of their residential facilities." The article was written and/or signed by all Jane Does and Witness 1 and Witness 2.

38.     Two days later, on April 18, 2014, Plaintiff received an email from Dean Culliton advising that he received a written statement from Jane Doe about the December 2013 text messages, along with her request to make a formal complaint of harassment and begin the disciplinary process. Plaintiff was advised to submit a written statement of his perspective of what occurred and was further advised that he was not allowed to attend any WSA meetings until this complaint could be adjudicated. Also copied on the email were Wesleyan's Title IX Officer, Antonio Farias, and Dean Backer.

39.     Following this advisement, Wesleyan never conducted an investigation into Jane Doe's allegations about the December 2013 text messages, or whether the totality of the circumstances and context in which the alleged harassment was said to have occurred was sufficiently severe to create an intimidating, hostile, or offensive living, learning and/or working environment.

40.     In fact, Wesleyan ignored the fact that Jane Doe continued to maintain her friendship and professional relationship with Plaintiff on the WSA after the December 2013 text messages. Wesleyan also ignored the fact that Jane Doe presented an incomplete copy of the December 2013 text message exchange; the full exchange of December 2013 text messages includes texts from Jane Doe exonerating Plaintiff of any wrongdoing. Wesleyan continued to accept Jane Doe's sudden allegations of "harassment" at face-value, prohibited Plaintiff's participation in the WSA without a formal hearing, and treated Plaintiff as "guilty before proven innocent."

41.     On April 20, 2014, the WSA passed the mandatory co-education proposal to ban all-male residential fraternities by a vote of 14 to 12, with one abstention and 10 absences, including Plaintiff. Because the vote was taken with exactly quorum, rumors began to circle that a "re-vote" would be taken at the following meeting on April 27, 2014. Students, particularly members of Greek life, reached out to Plaintiff

16

to take the lead on obtaining a re-vote.  However, Plaintiff had no choice but to abstain since the No Contact Order and Dean Culliton's advisement prevented him from participating in the WSA. Plaintiff was precluded from participating in a re-vote on the increasingly controversial mandatory "co-education" of fraternities proposal.

### D. <u>Dean Culliton Facilitates Mission To Silence Plaintiff</u>

42.    On April 21, 2014, Plaintiff attempted to meet with Dean Culliton to see a copy of Jane Doe's official written complaint. However, Dean Culliton claimed he was too busy and told Plaintiff to come back the following day instead.

43.    The following day, Plaintiff met with Dean Culliton and was informed that another "complaint" had been filed against him.  Jane Doe 2 reported allegations of non-consensual kissing and touching from a year prior, February 2013.

44.    Plaintiff was utterly blindsided by the allegations, as he had engaged in clearly consensual kissing with his friend, Jane Doe 2, at her invitation, on February 2013, and advised Dean Culliton as such. Also, the allegation did not make sense because they were good friends, hung out socially, and Jane Doe 2 asked Plaintiff to live with her several times, before and after the consensual kissing occurred in February 2013. Ultimately, Jane Doe 2 and Plaintiff did live together in the Summer of 2013. Jane Doe 2 was, however, a sponsor of the WSA mandatory co-education proposal and another influential member of the WSA. It was quickly becoming clear

that Plaintiff was the "sacrificial lamb" to a radical political movement that was willing to have their mandatory Wesleyan co-education proposal passed through the WSA at any and all costs.

45.     During this time, Plaintiff was unable to advise Dean Culliton of the existence of material witnesses or evidence in his defense, because he was not allowed to view the specific details of what he was being charged with.

46.     Yet, as a result of the complaints, Plaintiff was restricted from access to basic facilities on campus, banned from educational programs and events, and banned from attending future WSA meetings.

47.     When Plaintiff asked if he could see the official complaints so that he could respond to the suspiciously timed accusations, Dean Cullition refused to show him the complaints and advised that Plaintiff could review the complaints only after he submitted his own personal statements on what occurred.  Essentially, Plaintiff was being required to submit a response before he had even been allowed to review the details of the allegations being made against him.

48.     Visibly distraught by this outrageous accusation by a former friend and housemate from the previous summer, Dean Culliton scheduled Plaintiff for an "emergency counseling session" with Dr. Larry Antosz from Counseling and Psychological Services.

18

49.    Dr. Antosz became Plaintiff advisor throughout the student conduct process.

**E. <u>The Last Nail In the Coffin for Plaintiff</u>**

50.    Angry that Plaintiff was working behind the scenes to increase support for his opposition to mandatory co-education of residential fraternities, Witness 1 and Witness 2, together with the help of Jane Doe and Jane Doe 2, decided to rally another female student to help their cause, namely, Jane Doe 3. Jane Doe 3 happens to be friends with Jane Doe, Jane Doe 2 and Witness 1.

51.    On April 25, 2014, Plaintiff received a phone call from Dean Culliton to notify him that Jane Doe 3 had submitted a report regarding an incident of non-consensual touching stemming from September 2010.

52.    Perplexed and unable to recall any non-consensual acts, let alone from 4 years prior, Plaintiff asked for more details.    However, Dean Culliton callously responded, "you know what I'm talking about, the night on or around September 1 2010" without divulging any more detail. Dean Culliton ended his phone call with Plaintiff by reminding him to submit his response to the three complaints soon.

53.     Later that day, Plaintiff made an appointment to meet with Title IX Coordinator, Antonio Farias. Plaintiff advised that Dean Culliton treated Plaintiff as "guilty before proven innocent." Before formal charges were filed and before Plaintiff

was even found "responsible," Dean Culliton imposed unreasonable restraints on Plaintiff by disallowing him from attending WSA meetings or educational programs and events. At the conclusion of the meeting, Plaintiff felt assured that he could attend the subsequent WSA meeting so long as he was careful with his words and sensitive to the complainants' concerns.

54.    Instead, Plaintiff was advised the next day that he could not attend the re-vote that was scheduled to occur at the WSA meeting on April 27 because of the three complaints. Instead, Plaintiff was advised that he needed to contact Dean Culliton or Captain Paul Verrillo from Wesleyan's Office of Public Safety to provide a statement about what occurred from his perspective regarding the allegations from Jane Doe 2 and Jane Doe 3. Despite numerous demands, Dean Culliton refused to provide Plaintiff with the specific allegations against him from any of the three complaints.

55.    Although Plaintiff continued to cooperate with Wesleyan officials throughout the disciplinary process, Wesleyan continued its refusal to provide him with the right to view the actual written complaints against him.  As a result, Plaintiff was coerced into submitting three separate statements in response to the purported complaints without any knowledge of what the complaints specifically alleged.

56.    In his final semester of college, Plaintiff suffered tremendously as a result of Wesleyan's continued treatment of Plaintiff with a presumption of guilt. The no-

contact orders impeded upon Plaintiff's educational experience at Wesleyan and obstructed his ability to fulfill his obligations as an elected WSA member or ability to participate in educational programs and events, many of which were not included in tuition costs and had been prepaid in advance. There was a rush to judgment with little thought, if any, to the facts of what had actually occurred and Plaintiff was quickly treated with hostility as an outcast before any evidence against him had been presented or adjudicated on.

**F. Less Than 5 Days Before His First Hearing, Wesleyan Finally Provides Plaintiff With The Official Complaints**

57.    On May 1, 2014, nearly three weeks following Wesleyan's initial meeting with Plaintiff about the charges, and just 5 short days prior to his scheduled Hearing, Plaintiff was finally allowed to review his case file of the charges with Dean Culliton. However, he was advised that he must undergo an interview with Captain Verillo from the Office of Public Safety regarding Jane Doe 2 and Jane Doe 3's complaints *before* he could view the complaints.

58.    Plaintiff was advised that he was not permitted to have an attorney present during the disciplinary process, that Plaintiff could not have an official copy of his case file and that he was only allowed to take notes of the case file.

59.    Wesleyan scheduled Plaintiff's interview with Captain Verillo on May 1, 2014. By the time he was able to meet with Dean Culliton later that day, PLAINTIFF

had very little time to review the complaints and make notes before Dean Culliton told him that he was closing at 5:00 pm. Plaintiff was advised to come back on Saturday, May 3, 2014 if he wished to continue his review and note-taking.

60.     Upon his review of the detailed allegations made by Jane Doe, Plaintiff was stunned by the amount of false statements being made against him, which he had no opportunity to refute when he was asked to provide his statement in defense or interviewed by Captain Verillo. The incident between them involved a series of drunken text messages whereby Plaintiff uses language of a sexual nature to communicate with Jane Doe on the evening of December 14, 2013. In her written statement, Jane Doe disclaims spending time with Plaintiff socially even though they spent a significant amount of time together (documented by her written requests to hang out and drink together).     Jane Doe materially omitted the existence of her exonerating text messages to Plaintiff, namely, when she texted, "we all do dumb shit when we're drunk, we can definitely put it behind us."   Jane Doe flatly lied when she claimed that "Plaintiff literally yelled at a sexual assault survivor to stop saying negative things about fraternities" during a WSA meeting– such alleged statements are nowhere to be found in the WSA minutes for that meeting. Also, in her written statement, Jane Doe disclosed her intent in filing the complaint; she wanted to demonstrate that Plaintiff had a pattern of harassing women at Wesleyan, posed a

22

threat to every female on campus and was an egregious perpetrator of sexual misconduct. To make matters worse, Wesleyan failed to conduct any investigation into Jane Doe's complaint other than receive her written statement and Plaintiff's written response.

61.     Similarly, Jane Doe 2's written statement suffered from the same defects, namely, false statements and/or statements taken completely out of context against Plaintiff. The incident between them involved consensual kissing at Plaintiff's campus residence over one and half years ago on February 23, 2013. The consensual kissing also occurred just months before Jane Doe 2 asked Plaintiff to live with her in Washington, D.C. in the Summer of 2013. Jane Doe 2 falsely claimed that Plaintiff constantly texted her late at night and that on the evening that he invited her over, she expected that other friends would be present. Jane Doe 2 falsely claimed that she had trouble speaking to him for weeks and felt uncomfortable being in the same room with him. To the contrary, Jane Doe 2 sent Plaintiff substantial text messages, there are Facebook photos documenting a smiling Jane Doe 2 next to Plaintiff, and e-mail evidence that suggested otherwise. Jane Doe 2 also downplayed the salient fact that they lived together in Washington, D.C. the summer following their consensual kissing, at Jane Doe 2's repeated request.  Her statement admits that Jane Doe 2 made her complaint "to support Jane Doe's report" against Plaintiff.

62.     Lodging an even more tenuous claim, Jane Doe 3's written complaint alleged that she engaged in non-consensual kissing with Plaintiff on the evening of September 1, 2010, four years ago.  What her statement failed to disclose was the fact that, after flirting back-and-forth on September 1, 2010, Jane Doe 3 invited Plaintiff to walk with her that evening to an area on campus, the Butterfields Tunnels, where the two of them consensually kissed and touched each other.  Plaintiff eventually walked Jane Doe 3 to her dormitory room and left. Also missing from Jane Doe 3's complaint was the fact that she agreed to attend Plaintiff's fraternity formal event as his date in December 2010, which was a few months after the consensual encounter on September 1, 2010.   Plaintiff later learned this missing fact was redacted from the complaint by Dean Culliton. Instead, the only detail about the December 2010 formal event in her complaint was Jane Doe 3's false claim that her friend, Witness 1, picked her up from the formal event because she felt uncomfortable being around Plaintiff. In fact, Jane Doe 3 arrived extremely intoxicated to the formal, and Hannah Knudsen requested that Plaintiff walk Jane Doe 3 home as a result. Jane Doe 3 stated that she made the complaint to establish that Plaintiff has a pattern of sexually assaulting women, including Jane Doe and Jane Doe 2, who are friends of hers.

63.     Plaintiff was shocked by the collection of false allegations being made against him and Wesleyan's facilitation of same before Plaintiff had a proper hearing.

24

Plaintiff raised his concerns with Dr. Antosz, who agreed that the timing of Jane Doe 3's complaint on the heels of two others, and the connection amongst each of the complainants, was not a simple coincidence. Dr. Antosz agreed to be Plaintiff's process advisor for all three complaints when Plaintiff was notified he was not entitled to have legal representation during the Wesleyan adjudication process. Both Plaintiff and Dr. Antosz raised concerns to Wesleyan officials that Plaintiff was not being protected by standards of justice and fairness during the investigation or hearing process with the University, but their concerns fell on deaf ears.

64.     Plaintiff advised Dean Culliton that there were witnesses who could testify to refute Jane Doe's claim that Plaintiff "yelled at a sexual assault survivor" at a WSA meeting, namely, Nicole Brenner, Justin Gitlin, Ellen Paik and Colin O'Keefe. Plaintiff also mentioned the existence of exculpatory evidence, such as the meeting minutes for that WSA meeting. Since all of these witnesses were also members of WSA, they were available to testify to the relationship between Plaintiff and Jane Doe before and after the December 2013 text messages. In fact, Mr. O'Keefe submitted a written statement to refute Jane Doe's claim that Plaintiff created a hostile environment for WSA since Mr. O'Keefe was a fellow WSA member and knew both Plaintiff and Jane Doe. Wesleyan failed to adequately interview Ms. Brenner, Mr. Gitlin or Ms. Paik about Jane Doe's hostile environment claims, notwithstanding the

25

fact that all of these individuals were also members of WSA and knew both Plaintiff and Jane Doe.

65.    In support of his defense of Jane Doe 3's claims, Plaintiff stated that Hannah Knudsen could testify that she requested that Plaintiff walk Jane Doe 3 home from the December 2010 formal event. Ms. Knudsen's testimony would also establish that Witness 1 had provided false statements in support of Jane Doe 3's claims. However, Wesleyan failed to adequately interview or call Ms. Knudsen as a witness in support of Plaintiff's defense to Jane Doe 3's claims.

66.    Offering further exculpatory evidence, Plaintiff advised Dean Culliton about an email he received from a male Wesleyan student, who was Witness 1's boyfriend at the time, where the student discloses his knowledge that Jane Doe, Jane Doe 2 and Jane Doe 3 were working in collusion with Witness 1 and Witness 2 to brand Plaintiff as a "sexual predator" based on the fact that Plaintiff was leading the opposition to the mandatory co-education proposal. Wesleyan failed to follow up in any material way with the male Wesleyan student's email or the claim of collusion among Jane Doe, Jane Doe 2, Jane Doe 3 and Witness 1 and Witness 2.

67.    On May 1, 2014, when Plaintiff was called back to review the investigation report prepared by the Office of Public Safety, Plaintiff had a number of concerns. First, it was clear that the Office of Public Safety did not perform any

investigation whatsoever into Jane Doe's allegations of "harassment" for the December 2013 text messages. Also, it appeared that the Office of Public Safety did not interview a number of key witnesses to the allegations by Jane Doe, Jane Doe 2 and Jane Doe 3. Plaintiff's observation about the one-sided nature of the investigation fell on deaf ears.

68.    Upon information and belief, Plaintiff's witnesses were ignored in order to protect a false, anti-male biased narrative, and sought to make an "example" out of Plaintiff as a fraternity brother accused of sexual misconduct.

69.    Plaintiff attempted to advise Wesleyan that Witness 1 provided false statements about the September 2010 event surrounding Jane Doe 3. Plaintiff advised that Witness 1 had a motive to support Jane Doe, Jane Doe 2 and Jane Doe 3 and was acting out of retaliation when she provided her false statements to Wesleyan officials about Plaintiff. While he verbally requested that Wesleyan investigate this matter several times, he finally made a formal written complaint on May 16, 2014. However, there was no follow up by any Wesleyan official regarding Witness 1's violation of Wesleyan's Code of Non-Academic Conduct and Witness 1's statement was received at face value.

70.    Since Plaintiff was not allowed to view the specific allegations of the complaints against him prior to the close of the investigation, Plaintiff was precluded

from identifying relevant witnesses in his defense of the charges and/or witnesses who could help corroborate his version of the events or refute the version of events as stated by Jane Doe, Jane Doe 2 and Jane Doe 3.

71.   Clearly, Wesleyan never intended on conducting a full and fair investigation of the charges.   Pandering to the political climate and pressure from activists, Wesleyan treated Plaintiff as "guilty before proven innocent" and sought to make an "example" out of Plaintiff as a fraternity brother accused of sexual misconduct.

72.   Neither Dean Culliton nor Antonio Farias are independent fact finders or disinterested parties with any specialized training; they are both employed by Wesleyan and their role is essentially one of prosecuting sexual assault on campus. As such, when questioning Plaintiff throughout the process, Dean Culliton's line of questioning was more akin to cross-examination calculated to illicit a confession, rather than an objective attempt to factually reconstruct an event.   Dean Culliton referred much of the investigation to Captain Verillo, who also did not conduct a fair or thorough fact finding process.   Instead of performing an objective interview to identify witnesses, events and timelines, Dean Culliton and Captain Verillo only took notes on what they deemed important and disregarded everything else Plaintiff stated.

73.     Due to Wesleyan's delay in allowing Plaintiff to view the specific allegations against him, together with misleading statements by Dean Culliton, Dean Backer and Mr. Farias, Plaintiff was inadequately prepared to defend himself against Jane Doe's complaint, let alone all three complaints.

74.     On May 2, 2014, Wesleyan notified Plaintiff that his hearings for Jane Doe 2 and Jane Doe 3 would be held back-to-back in the morning and afternoon on May 9, 2014.  At this time, Plaintiff had not even finished his initial review of the allegations.

75.     Eventually, the hearing for Jane Doe 3 was re-scheduled for May 12, but only after Plaintiff's advisor, Dr. Antosz, argued that Wesleyan did not provide adequate notice and timing for all 3 hearings.

76.     At all times, Wesleyan shut Plaintiff out of the Wesleyan community without allowing Plaintiff an adequate opportunity to review and contest the specific allegations, and without conducting a full and fair investigation to corroborate the numerous false charges. Before holding a hearing on the charges, Wesleyan treated Plaintiff as "guilty."

77.     In stark contrast, upon information and belief, Dean Culliton took a narrative account from Jane Doe, Jane Doe 2 and Jane Doe 3 without leading questions and without hostility on the basis of their gender as the female accusers.

78.     In fact, less than 24 hours prior to his hearing regarding Jane Doe 3, Dean Culliton redacted relevant information from the case file that would have demonstrated that her accusations against Plaintiff were untruthful.

79.     Meanwhile, Dean Culliton prohibited Plaintiff from calling witnesses who would have been able to establish that the accusations by Jane Doe 3 were false.

80.     Upon information and belief, Dean Culliton's actions were based on an anti-male gender bias and Plaintiff's status as a fraternity brother.

**G. The Disciplinary Hearings**

81.     On May 6, 2014, May 9th, 2014, and May 12, 2014, Wesleyan held three hearings to address the allegations of Jane Doe, Jane Doe 2 and Jane Doe 3 (the "Hearings")

82.     In support of Jane Doe's allegations, Witness 1 and Witness 2 submitted written statements to suggest that Plaintiff was a "repeat offender" and had acted inappropriate toward women.

83.     Plaintiff was accompanied at the Hearings by Dr. Antosz, but he was not allowed to speak.

84.     Plaintiff was not entitled to have legal representation at the Hearings.

85.     Only unsworn "testimony" was given by Jane Doe, Jane Doe 2 and Jane Doe 3. The panel took such unsworn testimony at face value.

30

86.     Any written statements received in support of Jane Doe, Jane Doe 2 and Jane Doe 3 were unsigned and not notarized.

87.     At each Hearing, Dean of Students Scott Backer and panel members conducted the questioning of the parties and the witnesses. Such questioning was not utilized to illicit anything other than a confession from Plaintiff and/or support for the claim that Plaintiff was responsible for sexual misconduct.

88.     In the Hearing on Jane Doe's December 2013 text messages, Plaintiff attempted to show that Witness 1 and Witness 2's supporting statements contained false information that was wholly refuted by the WSA minutes and other witnesses, including other members of the WSA. However the panel did not question Witness 1 or 2 about this or permit other witnesses to refute Jane Doe's allegation of creating a hostile environment. Plaintiff requested that the panel question Jane Doe about her exonerating text messages to him and subsequent interactions and relationship with Plaintiff following the December 2013 text messages, but the panel refused to do so.

89.     In the Hearing on Jane Doe 3's allegations of non-consensual kissing in 2010, Plaintiff requested that the panel question Jane Doe 3 about her inconsistent behavior in accompanying him to his fraternity formal months after the alleged "non-consensual kissing" occurred.  However, the panel refused to question Jane Doe 3

31

about this and refused to allow any evidence of her attendance to Plaintiff's fraternity formal.

90.    In fact, the panel failed to ask most of Plaintiff's questions to the witnesses in all three Hearings.

91.    In accordance with his rights under Wesleyan's policies, Plaintiff mentioned the existence of several witnesses who possessed knowledge with respect to Jane Doe, Jane Doe 2 and Jane Doe 3.  However, Wesleyan either failed to properly utilize and/or question his witnesses, or failed to call them as a witness altogether.

92.    Additionally, Dean Culliton's act of redacting relevant information from Plaintiff's case file less than 24 hours prior to his hearing foreclosed Plaintiff from the opportunity to adequately defend the allegations against him and provided a slanted view of the facts in favor of the complainants. When Plaintiff attempted to advise the panel members about Dean Culliton's improper redactions of relevant information, PLAINTIFF was met with hostility from the panel and abruptly interrupted and yelled at.  The panel did not demonstrate any intent to get to the truth.

93.    In defense of the formal charges brought against him, Plaintiff requested that the panelists question Jane Doe, Jane Doe 2 and Jane Doe 3 about their conspiracy against Plaintiff through the filing of false complaints.  However, the panel refused to ask most of Plaintiff's questions, claiming that they were "irrelevant."

32

94.     Credibility and character of the accuser is critical when the accused is faced with a charge that amounts to nothing more than "he said, she said".  However, Wesleyan failed to perform any analysis of credibility of Jane Doe, Jane Doe 2 or Jane Doe 3, and failed to do the same for their witnesses.

95.     Upon information and belief, Wesleyan erroneously placed the entire burden on Plaintiff to prove his innocence, instead of setting forth competent evidence to demonstrate how Plaintiff allegedly engaged in non-consensual kissing with Jane Doe 3, or whether his December 2013 text messages were sufficiently severe to create a hostile environment for Jane Doe.

96.     Ultimately, Plaintiff was found "responsible" for violating Wesleyan's Discrimination and Harassment Policy with respect to the December 2013 text messages with Jane Doe, "responsible" for violating Wesleyan's Sexual Misconduct and Assault Policy with respect to his consensual kiss with Jane Doe 3 in September 2010, and "not responsible" for violating Wesleyan's Sexual Misconduct and Assault Policy with respect to Jane Doe 2 for their consensual kiss in 2013.

97.     As a result of being wrongfully found "responsible" for violating Wesleyan's Discrimination and Harassment Policy and Wesleyan's Sexual Misconduct and Assault Policy, Plaintiff was sanctioned to a "deferred suspension," which banned Plaintiff from campus immediately, notwithstanding that he was poised

33

to graduate in May of 2014 with High Honors, a 3.88 GPA, and an otherwise unblemished judicial record. Despite his distinguished career as an undergraduate at Wesleyan University, PLAINTIFF was not allowed to attend graduation or receive his diploma at Wesleyan's commencement celebration.

**H. Appeal of the Sanction**

98.    Following Plaintiff's receipt of the Decisions and Sanctions, Plaintiff filed his respective appeals, citing disproportionate sanctions, procedural errors, and an utter disregard for due process.

99.    Plaintiff requested to be allowed to stay on campus until the appeals were submitted and/or resolved. However, Wesleyan denied his request and Plaintiff was required to depart campus 48 hours later.

100.    On May 16, 2014 and May 21, 2014, Wesleyan rubber-stamped their decisions and denied Plaintiff's appeals.

**I. Plaintiff's Entire Future is Severely
    Damaged by Wesleyan's Actions**

101.    Due to the outcome of the profoundly unfair Hearings, Plaintiff's family was unable to attend such a milestone celebration.  Plaintiff's family had expended a tremendous amount of financial resources to prepare for commencement weekend, including flight and hotel accommodations, graduation memorabilia, and extended care for Plaintiff's grandfather who was anxiously waiting to watch the live webcast

34

of his grandson's commencement while in hospice care. Since Plaintiff's brother passed away prior to his graduation from college, resulting in a posthumous diploma, Plaintiff's commencement, in particular, was especially monumental to Plaintiff's grandfather and family.  Instead, this became a sudden emotional, psychological and financial nightmare for Plaintiff's family.

102.   In the summer of 2014, Plaintiff was able to secure a paid prestigious congressional staff assistant position due to his former summer internship with that same member of congress.  Due to his former work history with this member, Plaintiff was not required to produce his transcripts or diploma in order to secure the paid staff position.

103.  Plaintiff expended significant financial resources to purchase new professional attire and signed a 1-year lease for an apartment in Washington, D.C.

104.  Just one month later, an "anonymous" phone call was made to the congress member's office demanding to know how the congress member could employ an individual with a "record of being found guilty of multiple incidents of sexual misconduct at Wesleyan University."

105.  Four days following the phone call, Plaintiff was let go from his paid staff position and the Chief of Staff stated that, "This is not a comment on the validity

of the accusations or the validity of the proceedings but given the political reality of the situation it is in the best interest of the district to terminate your employment."

106.   The congress member's entire network has been prohibited from acting as references for Plaintiff's future employment, which effectively moots his last 2 years of professional experience as a congressional and campaign staffer.

107.   More recently, Witness 1 breached Wesleyan's confidentiality policies by sending an email to over 19 individuals, including students from Wesleyan's College of Social Studies, divulging the findings of Plaintiff's proceedings regarding Jane Doe, Jane Doe 2 and Jane Doe 3, and uttering defamatory statements and/or gravely misstating the outcome of his disciplinary hearings.

108.   Clearly, a significant breach of Wesleyan's confidentiality policies had taken place.   Upon information and belief, such breach was made with the aid of and/or due to negligence committed by Wesleyan officials.

109.   Plaintiff is at risk of further dissemination of confidential disciplinary records due to Wesleyan's negligence in maintaining the confidentiality of his records and/or failure to sanction Witness 1 for her breach of same.

110.   Plaintiff's emotional stability has been extremely compromised, and his ability to maintain any semblance of a healthy and stable life has been ruined. Plaintiff has been forced to seek extensive therapy in order to cope with the

repercussions of Wesleyan's actions. Additionally, his family has been pulled into a state of depression and mental tyranny.

111.   As a result of Wesleyan's blind acceptance of the outrageous accusations made by Plaintiff's former friends and as a result of Wesleyan's Orwellian and abhorrent treatment of Plaintiff, Plaintiff's reputation is tarnished, his future career prospects are ruined, and his overall economic future is completely compromised.

112.   Currently, Plaintiff's future career prospects in any field are at a standstill as a result of Wesleyan's wrongful decisions finding Plaintiff responsible of harassment and sexual misconduct, which have now tarnished Plaintiff's record, including Wesleyan's sanction of deferred suspension.

113. Plaintiff's academic and disciplinary record is irrevocably and irreversibly tarnished and will not withstand scrutiny by any transfer to another educational institution, including graduate studies.

114.   As a result of Wesleyan's actions, Plaintiff's parents' financial resources used to provide Plaintiff with an education at an esteemed four-year institution have been squandered.

115.   Any attempt to move on with his future in the face of Wesleyan's arbitrary and capricious decisions will be met with great resistance and little success; it is a known fact that the likelihood of his acceptance to a graduate institution of high

caliber is reduced in light of the high number of applicants and stiff competition, let alone the social stigma associated with being found responsible for "sexual misconduct."

## AS AND FOR THE FIRST CAUSE OF ACTION
### Violation of Title IX of the Education Amendments of 1972

116.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

117.   Title IX of the Education Amendments of 1972 provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

118.   Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972, even though there is very little direct federal funding of school sports.

119.   Upon information and belief, Wesleyan receives federal funding for research and development.

120.   Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish

grievance procedures providing for the prompt and equitable resolution of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (emphasis added).   Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[1]

121.   The procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also *accord[] due process to both parties involved...*"[2]

122.   The "prompt and equitable" procedures that a school must implement to "accord due process to both parties involved" must include, at a minimum:

- ▪ "Notice . . . of the procedure, including where complaints may be filed";

- ▪ "Application of the procedure to complaints alleging [sexual] harassment...";

- ▪ "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- ▪ "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

---

[1] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 19-20, 21 & nn.98-101.

[2] *Id.* at 22 (emphasis added).

- "Notice to the parties of the outcome of the complaint..."[3]

123.   A school also has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults." [4]

124.   Based on the foregoing, *supra,* at ¶¶ 31-97, Wesleyan has deprived Plaintiff, on the basis of his sex and association with his historic all-male residential fraternity, of his rights to due process and equal protection through the improper administration of and/or the existence, in its current state, of Wesleyan's guidelines and regulations.

125.   Based on the foregoing, *supra,* at ¶¶ 31-97, Wesleyan effectively shut Plaintiff out of the Wesleyan community without allowing Plaintiff an adequate opportunity to review and contest the specific allegations, and without conducting a full and fair investigation to corroborate the numerous false charges, and before holding a hearing on the charges, Wesleyan treated him as "guilty."

126.   Based on the foregoing, *supra,* at ¶¶ 31-97, Wesleyan conducted its investigation of the allegations of Jane Doe, Jane Doe 2 and Jane Doe 3 in a manner

---

[3] *Id.* at 20.

[4] *Id.* at 21.

that was biased against the male being accused.  Based on the panel's questions and treatment of Plaintiff, the investigation was slanted in favor of Jane Doe, Jane Doe 2 and Jane Doe 3 and took their statements at face-value.

127.   Wesleyan's failure to adequately interview key witnesses in support of Plaintiff defense demonstrates Wesleyan's favorable treatment of Jane Doe, Jane Doe 2 and Jane Doe 3 on the basis of their gender.

128.   Wesleyan has created an environment where an accused male student is fundamentally denied due process by being prosecuted through the conduct process under a presumption of guilt.  Such a one-sided process deprived Plaintiff, as a male student, of educational opportunities at Wesleyan on the basis of his sex.

129.   Wesleyan had no intention of following its own policies and procedures for Plaintiff as the male accused of sexual assault when it found Plaintiff responsible for sexual misconduct in the face of its outright failure to interview any witnesses in support of Plaintiff's defense and failure to present any evidence in support of the claim that Jane Doe 3 was allegedly coerced into kissing him, except for Jane Doe 3's say-so.

130.   Wesleyan had no intention of following its own policies and procedures for Plaintiff as the male accused of sexual assault when it found Plaintiff responsible of inappropriate text messaging with Jane Doe, despite evidence that Jane Doe sent

text messages to Plaintiff that she did not feel threatened by his messages and continued to maintain a friendship and professional relationship with Plaintiff.

131.   Wesleyan had no intention of following its own policies and procedures when it failed to follow up on Plaintiff's May 16, 2014 formal retaliation complaint against Witness 1 for her false statements in support of Jane Doe 3's complaint against him due to her friendship to Jane Doe 3 and political motives.

132.   Wesleyan policies effectuate a failure of due process for the student population, especially the male student population, in their current state because they encourage and facilitate the reporting of potentially false reports of sexual misconduct and/or other grievances without any recourse for those who may be falsely accused.

133.   Based on the foregoing, *supra,* at ¶¶ 31-97, Wesleyan imposed sanctions on Plaintiff that were disproportionate to the severity of the charges levied against him and without any consideration of his clean disciplinary record at Wesleyan, and without providing any written summary for the basis therefor.

134.   Based on the foregoing, *supra,* at ¶¶ 31-97, Wesleyan's guidelines and regulations disproportionately affect the male student population of the Wesleyan community as a result of the higher incidence of female complainants of sexual misconduct against male complainants of sexual misconduct. Recent national media focus and activism on Wesleyan's campus provide additional support for this fact.

135.   Based on the foregoing, *supra,* at ¶¶ 31-97, male respondents in sexual misconduct cases at Wesleyan are discriminated against solely on the basis of sex. They are invariably found guilty, regardless of the evidence, or lack thereof.

136.   Based on the foregoing, *supra,* at ¶¶ 31-97, Wesleyan treated Plaintiff as a "repeat offender" of sexual misconduct by banning him from educational programs and events and WSA meetings that he was obligated to attend as an elected official on the basis of self-serving, and admittedly collusive, statements made by three female complainants who were formerly friends of Plaintiff, two of whom were members of the WSA.

137.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE SECOND CAUSE OF ACTION
### Violations of Title IX OCR Rules

138.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

139.   The United States Department of Education Office for Civil Rights ("OCR") requires colleges that receive federal funds to adhere to Title IX of the Education Amendments of 1972, which prohibits discrimination on the basis of sex.

140.    OCR requires colleges to ensure that employees "likely to witness or receive reports of sexual harassment and violence" receiving training on practical information about how to identify and report sexual harassment and violence.

141.    OCR requires colleges to process complaints of sexual misconduct in accordance with its established procedures.

142.    OCR requires colleges to engage in "prompt, thorough, and impartial" investigations of allegations of sexual misconduct.

143.    OCR requires colleges to designate a Title IX coordinator to oversee all Title IX complaints and identify and address any patterns or systemic problems that arise during the review of such complaints.

144.    OCR requires colleges to ensure that their "Title IX coordinators have adequate training on what constitutes sexual harassment, including sexual violence, and that they understand how the [college's] grievance procedures operate."

145.    OCR requires colleges to utilize adequate, reliable, and impartial investigation of complaints, including an equal opportunity for both parties to present relevant witnesses and other evidence.

146.    OCR requires colleges to afford to the complainant and the accused student similar and timely access to any information that will be used at the hearing.

44

147.   OCR requires colleges to maintain documentation of all proceedings, which includes written findings of facts, transcripts or audio recordings.

148.   OCR requires colleges to ensure that all employees are trained with respect to applicable confidentiality requirements.

149.   OCR requires that all colleges "must provide due process to the alleged perpetrator."

150.   Based on the foregoing, *supra,* at ¶¶ 31-97, Wesleyan has deprived Plaintiff, on the basis of his sex and association with his historic all-male residential fraternity, of his rights to due process and equal protection through the improper administration of and/or the existence, in its current state, of Wesleyan's guidelines and regulations.

151.   Based on the foregoing, *supra,* at ¶¶ 31-97, Wesleyan conducted its investigation of the allegations, and subsequent Hearings, in a manner that was biased against the male being accused.   From the outset, the case file prepared by Dean Culliton and the investigations into the allegations conducted by Captain Verillo were slanted in favor of the female complainants and took their statements at face-value; key pieces of evidence pertinent to Plaintiff's defenses were not permitted or investigated; Plaintiff was repeatedly interrupted while the female complainants were

allowed to speak freely, and critical questions proposed by Plaintiff were arbitrarily and routinely ignored.

152.   Based on the foregoing, *supra,* at ¶¶ 31-97, Wesleyan treated Plaintiff as a "repeat offender" of sexual assault by banning him from educational programs and events, and WSA meetings that he was obligated to attend as an elected official on the basis of self-serving, and admittedly collusive, statements made by three female complainants, two of whom were members of the WSA, who were friends.

153.   Wesleyan's failure to adequately interview key witnesses in support of Plaintiff's defense to Jane Doe and Jane Doe 2, and outright failure to interview any witnesses in defense of Jane Doe 3, demonstrates Wesleyan's favorable treatment of Jane Doe on the basis of her gender.

154.   At the Hearing, Wesleyan only received prejudicial witness statements and took statements by Jane Doe, Jane Doe 2 and Jane Doe 3 at face value.  Wesleyan was completely dismissive of Plaintiff's attempts to engage in meaningful cross-examination of Jane Doe, Jane Doe 2 and Jane Doe 3 or their witnesses and dismissed most of Plaintiff's proposed questions.  Wesleyan failed to challenge their credibility on the issues of consent and political motives.

155.   With respect to Jane Doe 3, Wesleyan credited her claim that she was coerced into kissing Plaintiff and dismissed Plaintiff's claim that he did not coerce her, on the basis of gender discrimination against the male accused.

156.   Wesleyan has created an environment where an accused male student is fundamentally denied due process by being prosecuted through the conduct process under a presumption of guilt.  Such a one-sided process deprived Plaintiff, as a male student, of educational opportunities at Wesleyan on the basis of his sex.

157.   Wesleyan's stated policies and procedures, together with its violations thereof only with respect to Plaintiff as the male accused of sexual assault, demonstrates Wesleyan's gender-biased practices with respect to males accused of sexual assault at Wesleyan.

158.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE THIRD CAUSE OF ACTION
### Breach of Contract

138.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

139. Based on the aforementioned facts and circumstances, Wesleyan breached express and/or implied agreement(s) with Plaintiff.

140.   Wesleyan committed several breaches of its agreements with Plaintiff, including, without limitation:

> Wesleyan University is fully committed to a policy of equal opportunity and non-discrimination. The University does not discriminate on the basis of race, color, religion, national or ethnic origin, age, disability, veteran status, sex, marital status, sexual orientation, gender identity or gender expression.

2013-2014 Regulations, p. 2.

> The right to be protected by standards of justice and fairness in any proceedings with the University.
> Note: Fair and reasonable treatment should govern the access to and administration of all university facilities and programs.

2013-2014 Regulations, p. 3.

> It is Wesleyan policy to keep the records of Wesleyan students confidential.  Information about students is shared within the University only as needed for legitimate educational purposes.

2013-2014 Regulations, p. 39.

> Wesleyan will not disclose educational records other than "directory information"…Whenever exceptional action is called for and as appropriate, an effort will be made to notify the student as soon as possible.

2013-2014 Regulations, p. 40.

> IV. JUDICIAL PROCEDURES
> B. STUDENTS' RIGHTS
>    11. Confidentiality regarding the outcome of the hearing (except for the complainant's right to be informed of the hearing decision) and any subsequent appeal.

48

2013-2014 Regulations, p. 11.

141.   Based on the foregoing, *supra,* at ¶¶ 31-97, Wesleyan has deprived Plaintiff, on the basis of his sex, of his rights to due process and equal protection through the improper administration of and/or the existence, in its current state, of Wesleyan's guidelines and regulations.

142.   Based on the foregoing, *supra,* at ¶¶ 31-97, Wesleyan failed to protect Plaintiff by standards of justice and fairness during his investigation and hearing process with the University.

143.   Based on the foregoing, *supra,* at ¶¶ 31-97, a significant breach of Wesleyan's confidentiality policies took place with respect to the information contained in Plaintiff's educational file.   Upon information and belief, such breach was made with the aid of and/or due to negligence committed by Wesleyan officials.

144.   As a direct and foreseeable consequence of these breaches, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, economic injuries, the loss of a paid prestigious congressional staff assistant position, and other direct and consequential damages.

145.   Plaintiff is entitled to recover damages for Wesleyan's breach of the express and/or implied contractual obligations described above.

146.   As a direct and proximate result of the above conduct, actions and inactions, Plaintiff has suffered physical, psychological, emotional and reputational damages, economic injuries and the loss of educational and post-graduate opportunities.

147.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE FOURTH CAUSE OF ACTION
### Covenant of Good Faith and Fair Dealing

148.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

149.   Based on the aforementioned facts and circumstances, Wesleyan breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with Plaintiff by meting out a disproportionate sanction of deferred suspension against Plaintiff, notwithstanding the lack of evidence in support of Jane Doe 3's claim of non-consensual kissing and in light of Jane Doe's exonerating text messages in response to Plaintiff's alleged inappropriate text messages.  The sanction is also disproportionate considering that Plaintiff, together with Jane Doe and Jane Doe 3, were all graduating seniors at the time and Plaintiff had no prior history of misconduct.

150.   As a direct and foreseeable consequence of these breaches, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, economic injuries, the loss of a paid prestigious congressional staff assistant position, and other direct and consequential damages.

151.   Plaintiff is entitled to recover damages for Wesleyan's breach of the express and/or implied contractual obligations described above.

152.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**AS AND FOR THE FIFTH CAUSE OF ACTION**
**<u>Estoppel and Reliance</u>**

153.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

154.   Wesleyan's various policies constitute representations and promises that Wesleyan should have reasonably expected to induce action or forbearance by Plaintiff.

155.   Wesleyan expected or should have expected Plaintiff to accept its offer of admission, incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied promises that Wesleyan would not tolerate, and Plaintiff would not suffer, harassment by fellow students and would not deny Plaintiff

his procedural rights should he be accused of a violation of Wesleyan's 2010-2011 Regulations and 2013-2014 Regulations.

156.   Plaintiff relied to his detriment on these express and implied promises and representations made by Wesleyan.

157.   Based on the foregoing, Wesleyan is liable to Plaintiff based on Estoppel.

158.   As a direct and foreseeable consequence of these breaches, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, economic injuries, the loss of a paid prestigious congressional staff assistant position, and other direct and consequential damages.

159.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE SIXTH CAUSE OF ACTION
### Negligence

160.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

161.   Wesleyan owed duties of care to Plaintiff. Such duties included, without limitation, a duty of reasonable care in the conduct and investigation of the allegations of harassment and sexual assault against him.

162.   Wesleyan breached its duties owed to Plaintiff.

163.    Based on the foregoing, *supra,* at ¶¶ 31-97, a significant breach of Wesleyan's confidentiality policies took place with respect to the information contained in Plaintiff's educational file.  Upon information and belief, such breach was made with the aid of and/or due to negligence committed by Wesleyan officials.

164.    As a direct and foreseeable consequence of these breaches, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, economic injuries, the loss of a paid prestigious congressional staff assistant position, and other direct and consequential damages.

165.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE SEVENTH CAUSE OF ACTION
## <u>Negligent Infliction of Emotional Distress</u>

166.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

167.    Wesleyan owed duties of care to Plaintiff. Such duties included, without limitation, a duty of reasonable care in conducting the investigation of the allegations of harassment and sexual assault against him.

168.    Wesleyan's conduct created an unreasonable risk of causing the Plaintiff emotional distress in that Plaintiff's academic and disciplinary record is irrevocably

and irreversibly tarnished and will not withstand scrutiny by any transfer to another educational institution, including graduate studies. The timing of Wesleyan's adverse decision came just days before Plaintiff's expected graduation date, and his family (already on location on campus) was unable to attend such a milestone celebration.

169.   As a direct and foreseeable consequence of Wesleyan's actions, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, economic injuries, the loss of a paid prestigious congressional staff assistant position, and other direct and consequential damages.

170.   Plaintiff's emotional distress as a result of his tarnished academic record was foreseeable because it is widely known that competition in higher education and employment is very high, and the likelihood of Plaintiff's acceptance to a graduate institution of high caliber is now diminished due to Wesleyan's adverse decision. Furthermore, Plaintiff's emotional distress resulting from the social stigma associated with being found responsible for "sexual misconduct" was also foreseeable.   Any attempt to move on with Plaintiff's future in the face of Wesleyan's arbitrary and capricious decisions will be met with great resistance and little success.

171.   The emotional distress was severe enough that it has resulted in illness and/or harm to Plaintiff, namely, Plaintiff's emotional stability has been extremely compromised, and his ability to maintain any semblance of a healthy and stable life

has been ruined.  Plaintiff has been forced to seek extensive therapy in order to cope with the repercussions of Wesleyan's actions.

172.   Wesleyan's conduct was the cause of the Plaintiff's distress.

173. Considering that Plaintiff's entire academic future and future employment opportunities would suffer as a result of the adverse decision, Wesleyan should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or harm.

174.   Plaintiff's distress is reasonable in light of Wesleyan's conduct.

175.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE EIGHTH CAUSE OF ACTION
### Declaratory Judgment

176.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

177.   Wesleyan has committed numerous violations of the Parties' contracts and of federal and state law.

178.  Plaintiff's education and future career has been severely damaged. Without appropriate redress, the unfair outcome of the Hearings involving Jane Doe

55

and Jane Doe 3 will continue to cause irreversible damages to Plaintiff's educational career and future employment prospects, with no end in sight.

179.   More recently, Witness 1 breached Wesleyan's confidentiality policies by sending an email to over 19 individuals, including students from Wesleyan's College of Social Studies, divulging the findings of Plaintiff's proceedings regarding Jane Doe, Jane Doe 2 and Jane Doe 3, and uttering defamatory statements and/or gravely misstating the outcome of his disciplinary hearings.

180.   Plaintiff is at risk of further dissemination of confidential disciplinary records due to Wesleyan's negligence in maintaining the confidentiality of his records and/or failure to sanction Witness 1 for her breach of same.

181.   Plaintiff has already lost a paid prestigious congressional staff assistant position due to the significant breach of confidentiality involving Plaintiff's disciplinary records, which was facilitated by Wesleyan.

182.   As a result of the foregoing, there exists a justiciable controversy between the Parties with respect to the outcome, permanency, and future handling of Plaintiff's formal student record at Wesleyan.

183.   By reason of the foregoing, Plaintiff requests, pursuant to 28 U.S.C. § 2201, a declaration that: (i) the outcome and findings made by Wesleyan at Plaintiff's Hearings be reversed; (ii) Plaintiff's reputation be restored; (iii) Plaintiff's disciplinary

record be expunged; (iv) the record of Plaintiff's deferred suspension from Wesleyan be removed from his education file; (v) any record of Plaintiff's Hearings be permanently destroyed; and (vi) Wesleyan's rules, regulations and guidelines are unconstitutional as applied.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Wesleyan as follows:

(i)     on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, the loss of a paid prestigious congressional staff assistant position, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii)    on the second cause of action for violation of OCR rules, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, the loss of a paid prestigious congressional staff assistant position, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)   on the third cause of action for breach of contract, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, the loss of a paid prestigious congressional staff assistant position, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)    on the fourth cause of action for breach of the covenant of good faith and fair dealing, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological emotional distress, economic injuries, the loss of a paid prestigious congressional staff assistant position, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)     on the fifth cause of action for estoppel and reliance, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, the loss of a paid prestigious congressional staff assistant position, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)    on the sixth cause of action for negligence, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, the loss of a paid prestigious congressional staff assistant position, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vii)   on the seventh cause of action for negligent infliction of emotional distress, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, the loss of a paid prestigious congressional staff assistant position, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(viii)  on the eighth cause of action for a declaratory judgment pursuant to 28 U.S.C. § 2201, a judicial declaration that: (i) the outcome and findings made by Wesleyan at Plaintiff's Hearings be reversed; (ii) Plaintiff's reputation be restored; (iii) Plaintiff's disciplinary record be expunged; (iv) the record of Plaintiff's deferred suspension from Wesleyan be removed from his education file; (v) any record of Plaintiff's Hearings be permanently destroyed; and (vi) Wesleyan's rules, regulations and guidelines are unconstitutional as applied; and

(ix)    awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

**Dated:  New York, New York
December 2, 2015**

**Respectfully submitted,**

**Plaintiff Scott Elias**

**By: /s/**                  
**Jeffrey Hellman, Esq. (CT04102)
Law Offices of Jeffrey Hellman, LLC
195 Church Street, 10th Floor
New Haven, Connecticut 06510
(203) 691-8762
jeff@jeffhellmanlaw.com**

**-and-**

**Kimberly C. Lau, Esq. (*pro hac vice* admitted)
Warshaw Burstein, LLP
555 Fifth Avenue
New York, New York 10017
(212) 984-7700
klau@wbcsk.com**

**JURY DEMAND**

      Plaintiff herein demands a trial by jury of all triable issues in the present matter.

**Dated: New York, New York**
        **December 2, 2015**

                        **Respectfully submitted,**

                        **Plaintiff Scott Elias**

                        **By: /s/**_____
                        **Jeffrey Hellman, Esq. (CT04102)**
                        **Law Offices of Jeffrey Hellman, LLC**
                        **195 Church Street, 10th Floor**
                        **New Haven, Connecticut 06510**
                        **(203) 691-8762**
                        **jeff@jeffhellmanlaw.com**

                          **-and-**

                        **Kimberly C. Lau, Esq. (*pro hac vice* admitted)**
                        **Warshaw Burstein, LLP**
                        **555 Fifth Avenue**
                        **New York, New York 10017**
                        **(212) 984-7700**
                        **klau@wbcsk.com**

61